OPINION
{¶ 1} Appellants, Dr. Edward Walker ("Dr. Walker"), Dr. Han Soo Shin ("Dr. Shin"), and Radiology Associates of Warren, Inc. ("Radiology Associates"), appeal from the judgment of the Trumbull County Court of Common Pleas entered upon the jury verdict in this medical malpractice case in favor of appellees Carol Celmer and Michael Celmer ("the Celmers").
 {¶ 2} On April 28, 2000, appellees filed a civil action against Dr. Robert Rodgers, Dr. James Goettsch, Dr. Sharon George, and appellants, Dr. Shin, and Dr. Walker and Radiology Associates of Warren. The Celmers subsequently dismissed St. Joseph Health Center and settled their claims against Dr. George, Dr. Rodgers, and Dr. Goettsch for an aggregate amount of $325,000. The case proceeded to trial as to appellants, Dr. Walker, Dr. Shin, and Radiology Associates. On December 3, 2003, appellants filed a motion for summary judgment, which was denied by the court on April 13, 2004.
 {¶ 3} Prior to trial the parties agreed that in the event of a jury verdict in favor of the appellees, the appellants were entitled to a monetary setoff in the amount of the settlement with the former co-defendants. Thus, the parties stipulated that the sum of $325,000 would be subtracted from any potential verdict in favor of the Celmers.
 {¶ 4} The case proceeded to trial on May 18, 2004. On May 19, appellees presented the testimony of Dr. Jay Thompson, a board certified radiologist as an expert witness to testify on the issue of standard of care as it pertained to appellants. Appellants filed a motion to exclude the testimony of Dr. Thompson, based upon Evid.R. 601(D). The court conducted a voir dire of Dr. Thompson, outside the presence of the jury. After the voir dire and arguments by counsel, the trial court denied appellants' motion to exclude Dr. Thompson.
 {¶ 5} At the close of appellees' case in chief, appellants moved for a directed verdict on the grounds of causation. The trial court denied appellants' motion.
 {¶ 6} The following facts were revealed at trial. In February of 1996, Carol Celmer became a patient of Dr. George, a family practice physician in Warren. Carol's first mammogram while under the care of Dr. George occurred on February 8, 1997. This mammogram was interpreted by Dr. Rodgers and Dr. Goettsch as normal with no evidence of malignancy. On February 6, 1998, Dr. George sent Carol for another mammogram, which was interpreted by Dr. Walker. As a part of his interpretation, Dr. Walker testified that he reviewed Carol Celmer's previous mammogram and compared both films to determine if there were any changes. Walker interpreted the films as normal, and he did not recommend or order any additional studies. A copy of his radiology report was sent to and received by Dr. George. On August 1998, Carol had another appointment with Dr. George. At that time, Carol Celmer informed Dr. George that she had a lump in her right breast. Dr. George diagramed the area of concern in her office chart. According to Dr. George, and the diagram contained in Carol Celmer's medical records, the lump was located in a position of "nine o'clock." After palpating the lump, Dr. George testified that she thought the lump was caused by fibrocystic disease, a benign conation. Dr. George did not order any further work up of the lump at that time.
 {¶ 7} On December 9, 1998, Dr. George ordered a mammogram and breast ultrasound. Appellant, Dr. Walker, interpreted the mammogram as normal with no signs of malignancy. Following the mammogram, Carol underwent an ultrasound of her right breast. The ultrasound was performed by a technician, and the films were interpreted by appellant, Dr. Shin. He interpreted the ultrasound as showing tiny benign cystic lesions at the "nine o'clock" position on the right breast. Appellant, Dr. Shin, testified that the cysts were so small, that neither the patient nor a physician would have been able to detect the lesions on a physical examination. Appellant, Dr. Shin, did not recommend any further studies on Carol regarding her palpable lump.
 {¶ 8} The reports from appellee Carol Celmer's December mammogram and ultrasound were sent to Dr. George, who testified that she relied upon the interpretations and that she felt reassured by the "normal" interpretations, especially because of the findings that there were only benign cysts at the "nine o'clock" position on Carol's right breast.
 {¶ 9} One year later, in December 1999, Dr. George ordered an annual mammogram for Carol. This study was interpreted as showing an area suspicious for malignancy in Carols' right breast. Upon receiving the results of this mammogram, Dr. George immediately referred appellee Carol Celmer to a surgeon. As a result of Dr. George's referral, she underwent a surgical biopsy, which led to a diagnosis of breast cancer. Further surgery indicated that the cancer had spread to her lymph nodes. Despite treatment, the cancer eventually spread to appellee Carol Celmer's liver, ribs, and several areas of her bones. Testimony at trial established that she has only a 15 percent chance of survival.
 {¶ 10} On May 24, 2004, the jury returned a verdict in favor of the appellees for the sum of $200,000. On May 25th, the trial court entered judgment on the verdict. On June 1, 2004, appellants filed a motion to reconsider judgment on the verdict and requested that the trial court enter a judgment nunc pro tunc, reducing the verdict amount by the amount of the settlement. On that same day the trial court entered a nunc pro tunc judgment awarding the Celmers the sum of zero dollars. Appellees then filed a motion to reconsider awarding setoff and a motion for new trial on damages. Both motions were denied by the court on June 16, 2004. Appellants timely filed the instant appeal and present the following assignments of error for our review:
 {¶ 11} "[1.] The trial court abused its discretion in permitting the testimony of Appellees' standard of care expert, Jay Thompson, M.D., because he was not engaged in active clinical practice at the time of his testimony.
 {¶ 12} "[2.] The trial court erred in denying Appellants' Motion for Directed Verdict because there was no evidence that Appellants' actions or omissions proximately caused harm to Appellees."
 {¶ 13} In their first assignment of error, Appellants contend that the trial court erred in permitting the expert testimony of radiologist, Dr. Jay Thompson ("Dr. Thompson"), regarding the proper standard of medical care, because he failed to satisfy the qualification requirements of Evid.R. 601(D). Specifically, appellants argue that Dr. Thompson was not qualified to testify pursuant to Evid.R. 601(D) because it was established that he did not devote at least half of his professional time to active clinical practice in his field of radiology.
 {¶ 14} "`The qualification of an expert is a matter for determination by the trier of the facts, and "rulings with respect to such matters will ordinarily not be reversed unless there is a clear showing that the court abused its discretion."'"Campbell v. Warren Gen. Hosp. (1994), 105 Ohio App. 3d 417, at 421. (Citations omitted.) An abuse of discretion is defined as a decision that is unreasonable, arbitrary or unconscionable, rather than a mere error in judgment. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219.
 {¶ 15} Evid.R. 601(D) governs whether or not a doctor is competent to testify as an expert at trial. The rule reads, in pertinent part, "[e]very person is competent to be a witness except: * * * (D) A person giving expert testimony on the issue of liability in any claim asserted in any civil action against a physician, podiatrist, or hospital arising out of the diagnosis, care, or treatment of any person * * * unless the person testifying is licensed to practice medicine * * * and unless the person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school." Accordingly, the proponent of a doctor's expert testimony first must show that the doctor is licensed to practice medicine in Ohio or any other state. Second, the proponent must show that the doctor devotes at least one-half of his professional time to active clinical practice or instruction in an accredited university.
 {¶ 16} In the case sub judice, it is undisputed that Dr. Thompson was duly licensed in diagnostic radiology in the State of Ohio at the time of the trial. Appellants contend that Dr. Thompson failed to qualify as an expert witness based upon his admission that he was not actively practicing medicine at the time of the trial, and the immediate preceding seven months.
 {¶ 17} The purpose of the "active clinical practice" rule is to "preclude testimony by the physician who earns his living or spends much of his time testifying against his fellows as a professional witness, and to prevent those whose lack of experiential background in the very field they seek to judge, the clinical practitioner, makes the validity of their opinions suspect, from expressing those opinions for pay or otherwise."McCrory v. State (1981), 67 Ohio St.2d 99, 103.
 {¶ 18} Although Evid.R. 601(D) use the present tense, "* * * the standard is more directly concerned with the past. The essential inquiry made in the test is retrospective: has that witness acquired that special experience * * * or experiential background * * * in the field he seeks to judge? A literal and strict interpretation of the statute focusing only on the present ignores the historical nature of the inquiry and the true purpose of the statute. It might even permit the testimony of a novice currently in practice yet exclude the testimony of an experienced clinical practitioner who is not. It would not serve the purposes of the statute or the ends of justice to exclude the assistance of the experienced specialist whose clinical practice spanned decades, because he is now retired. The true purpose of the statute is to ensure competency, and a strict application of the text in its literal sense fails to do that." (Citations omitted.)Crosswhite v. Desai (1989), 64 Ohio App.3d 170, 178.
 {¶ 19} In Crosswhite, the plaintiff sought to introduce testimony of his second treating physician, who had since retired. The physician recited in his affidavit that, though he was retired, he had devoted seventy-five percent of his professional time to clinical practice for thirty-three years. His thirty-three years of active clinical practice included all times relevant to the lawsuit. Additionally, the physician had actually treated the plaintiff. The court determined that excluding the expert's testimony would thwart the purpose of Evid.R. 601(D).
 {¶ 20} "`[T]he rule merely establishes the competence of the witness and the parties are free to attack the credibility of the witness who spends little time in clinical practice.'"Crosswhite, at 177, quoting Wise v. Doctors Hosp. (1982),7 Ohio App.3d 331, 334. In Crosswhite, the court observed that in effectuating the purposes of the Rule, its limitations should not be applied so narrowly that the right of redress in a medical claim collapses under an undue burden. Crosswhite, at 177. Instead, "[o]nce established, the quality of that experiential base and the credibility of the witness is subject to attack through cross-examination." Id. at 178.
 {¶ 21} In this case, the court conducted a voir dire examination of Dr. Thompson. Dr. Thompson testified that he spent all of his profession time in the active practice of diagnostic radiology in the years 1997, 1998, 2000, 2001. He further testified that in 2002, he joined Euclid Radiology where he worked 28 weeks per year. In October 2003, Dr. Thompson left his employment with Euclid Radiology, and relocated to Florida. For a period of about seven months prior to the trial, from November of 2003 until April of 2004, Dr. Thompson testified that he was not engaged in the practice radiology.
 {¶ 22} In April 2004, Dr. Thompson returned to Ohio and secured employment with Locum Tenens Medical Associates. As of the date of the voir dire examination, Dr Thompson testified that he had not secured placement and was not "practicing medicine" as of that date. However, he testified that he was "in the process of filling out the various applications forms, and will be learning how to read radiographs on computer which is probably going to take two or three weeks".
 {¶ 23} In its decision the court noted the fact that "were this case to be tried on its first trial date, this would be a moot issue." The court further stated: "first of all, the standard of care that we're involved with involves the time period 97, 98, 99, at which time, * * * it's uncontradicted that this doctor was practicing * * * medicine and devoting at least from the testimony 100 percent of the time doing clinical in terms of radiology." The court further noted that "we're all certainly aware of situations where something changes in the medical profession and a certain type of prescription for medication one year is totally appropriate, and two years later it would be malpractice; that is not the issue in this case." "* * * The court further stated if this person would have been otherwise competent on the original trial date and circumstances beyond any of the parties control caused it to be bumped because of other cases, and it's not a matter of years, but a matter of certain months, irrespective of what I already judicated as to why I think he would be otherwise competent."
 {¶ 24} Applying the foregoing to the applicable law, we find that the trial court did not abuse its discretion by finding Dr. Thompson competent to testify under Evid.R. 601(D). The fact that Dr. Thompson did not practice for a limited period only raised a question as to the credibility of his testimony, not its competency. See, DiSilvestro v. Quinn, (Dec. 31, 1996), 11th Dist. No. 95-L-061, 1996 Ohio App. LEXIS 5950, at 21. Further, while the phrase "active clinical practice" generally describes treating patients, "it also includes the physician-specialist whose work is so related or adjunctive to patient care as to be necessarily included in that definition * * *." McCrory at 104. Thus, flexibility is permitted in determining whether a physician spends an adequate percentage of time engaged in active clinical practice. Although Dr. Thompson admitted that he had not practiced clinical radiology in the seven months preceding the trial, his testimony established that at the time of trial he was preparing to engage in a related field of study, i.e., reading of computer radiographs in his new position with Locum Tenens Medical Associates. Based upon the foregoing, appellants' first assignment of error is without merit.
 {¶ 25} In their second assignment of error, appellants assert that the trial court erred in denying their motion for directed verdict.
 {¶ 26} Appellants claim that the trial court erred in failing to grant their motion for directed verdict because appellees failed to submit evidence that appellants caused harm. Appellants' claim rests on testimony that Dr. George breached her standard of care duty by failing to order a biopsy regardless of any interpreted results from the mammogram and ultrasound studies conducted by appellants. Thus, appellants argue that reasonable minds could not disagree that it was the sole failure of Dr. George to order a breast biopsy of Carol Celmer, that caused her delayed diagnosis of breast cancer. As such, appellants conclude the judge erred in overruling their motion for directed verdict because reasonable minds could come to but one conclusion with respect to the cause of appellee, Carol Celmer's, delayed diagnosis, i.e., the failure of Dr. George to order a biopsy.
 {¶ 27} The standard for determining a motion for a directed verdict is well-established under Ohio law: "[c]iv.R. 50(A)(4) provides that a court should direct a verdict when, `after construing the evidence most strongly in favor of the party against whom the motion is directed, [it] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *.' Conversely, if reasonable minds could come to more than one conclusion on the evidence presented, the court should permit the issue to go to the jury." White v.Ohio Dept. of Transp. (1990), 56 Ohio St.3d, 39, 45. "Civ.R.50(A) * * * requires the trial court to give the nonmoving party the benefit of all reasonable inferences that may be drawn from the evidence." Connolly v. Malkamaki, 11th Dist. No. 2001-L-124, 2002-Ohio-6933, at ¶ 15, citing Broz v. Winland
(1994), 68 Ohio St.3d 521, 526; Keeton v. Telemedia Co. of S.Ohio (1994), 98 Ohio App.3d 405, 408. A motion for a directed verdict presents a question of law that an appellate court reviews de novo. Nichols v. Hanzel (1996), 110 Ohio App.3d 591,599.
 {¶ 28} In Ohio, a party must satisfy four basic elements to establish a claim for medical malpractice: (1) the existence of a duty owed to the plaintiff by the physician; (2) a breach of this duty by the physician; (3) a showing of the probability that the breach was a proximate cause of the harm to the plaintiff; and (4) damages. DiSilvestro, at 6-7.
 {¶ 29} In relation to the second and third elements of the claim, the Supreme Court of Ohio has held: "In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things." Bruni v.Tatsumi (1976), 46 Ohio St.2d 127, paragraph one of the syllabus.
 {¶ 30} In order to show that the actions of the physician fell below the standard of care and that this breach was the cause of the injuries, Bruni requires a plaintiff to present expert testimony. DiSilvestro, at 7-8, citing Kurzner v.Sanders (1993), 89 Ohio App.3d 674, 679. In particular, an expert witness must testify as to the applicable standard of care, the breach of that standard and proximate cause.DiSilvestro, at 8. In the instant case, appellants argue that the element of proximate cause was not met. At trial both appellees and appellants presented expert witnesses regarding causation: [W]hen asked whether he had an opinion to a reasonable probability as to whether Dr. Walker and Dr. Shin met the standard of care in interpretation, appellees' expert, Dr. Thompson, testified that "the standard of care was not met." Dr. Thompson further testified that that the February 6, 1998 mammogram showed signs of cancer and that Dr. Walker should have reported those findings. Dr. Thompson also testified that the Dec 9, 1998 mammogram showed even more signs of cancer and the ultrasound films showed suspicious findings. Dr. George testified that when she receives abnormal findings she refers her patients to a surgeon for a biopsy.
 {¶ 31} On cross-examination Dr. Thompson testified that, "I believe that the lesion should have been discovered and worked up in 1997, and that it should have been discovered on every subsequent examination."
 {¶ 32} "Q: And the misreads were so gross and egregious that you believe that they have committed malpractice or fallen below the standard of care?"
 {¶ 33} "A: Yes, I believe that."
 {¶ 34} However, Dr. Thompson further testified that that Dr. George had a duty to order a breast biopsy, regardless of the results of the mammograms.
 {¶ 35} In reviewing the propriety of motions for a directed verdict, the appellate courts of this state have indicated that the fact that the testimony of an expert witness has been tested during cross-examination does not warrant the granting of such a motion unless the expert contradicts or recants his testimony.Nichols v. Hanzel, at 602. "Once an expert properly states his professional opinion to a properly formed question as to `probability,' he * * * has established a prima facie case as a matter of law. Erosion of that opinion due to effective cross-examination does not negate that opinion, rather it only goes to weight and credibility. Thus, it would not usually be a suitable instance for application of a directed verdict. The exception would be when the expert actually recants the opinion on cross." Galletti v. Burns Internatl. (1991),74 Ohio App.3d 680, 684. In the instant case, Dr. Thompson did not recant his opinions during cross-examination. The testimony of Dr. Thompson was sufficient to establish a prima facie case as to the three elements of a medical malpractice claim.
 {¶ 36} Appellants' expert witness, Dr. Dennis Citrin ("Dr. Citrin"), testified that mammograms are not sufficiently reliable to distinguish a cancerous breast lump from a non-cancerous breast lump. Therefore, he concluded that Dr. George had an independent duty to order a biopsy. However, Dr. Citrin further testified that that if the findings of cancer would have been discovered in February of 1998, at the time of the mammogram, Celmer's survival rate would have been an 80 percent to 90 percent cure rate. By December 9, 1998, at the time of the mammogram and ultrasound, her survival rate dropped to a 75 percent to 80 percent. When the cancer was actually diagnosed in December of 1999, her survival rate had diminished to 15 percent.
 {¶ 37} While it is undisputed that Dr. George breached her duty of standard of care by failing to refer appellee, Carol Celmer, to a surgeon in 1998, when she first presented with a palpable breast mass, it is well-accepted that two factors can combine to produce damage or illness, each being considered a proximate cause of the injury. Norris v. Babcock Wilcox Co.
(1988), 48 Ohio App.3d 66, 67. However, the causal connection between a defendant's act and the resulting damage may be broken by an intervening cause. Queen City Terminals, Inc. v. Gen. Am.Transp. Corp. (1995), 73 Ohio St.3d 609, 619. An intervening cause does not operate to sever the causal link if the alleged intervening cause was reasonably foreseeable by the one who is guilty of the negligence. Neff Lumber Co. v. First Nat'l. Bank
(1930), 122 Ohio St. 302, 309.
 {¶ 38} In the case sub judice, we find that the negligence of Dr. George did not rise to the level of a superceding cause. A superceding cause, which serves to intervene and eliminate a tortfeasor's liability for his initial negligence, exists when the causal connection is broken by a subsequent act, or failure to act, which intervenes and completely removes the effect of the initial negligence and is itself the proximate cause of the plaintiff's damage. Hurt v. Charles J. Rogers Transp. Co.
(1955), 164 Ohio St. 323, 326. In Cascone v. Herb Kay Co.
(1983), 6 Ohio St.3d 155, 160, the Ohio Supreme Court, relying onMudrich v. Standard Oil Co. (1950), 153 Ohio St. 31, and Mousev. Central Savings Trust Co. (1929), 120 Ohio St. 599, emphasized that the causal connection between the initial negligence is broken and superceded by later negligence only if the latter is both new and independent. "New" means the later negligence could not reasonably have been foreseen, and by "independent" we mean the absence of any connection or relationship of cause and effect between the original and subsequent negligence. Grange Mut. Cas. Co. v. Fleming (1982), 8 Ohio App. 3d. 164, 167.
 {¶ 39} In this case, it is important to remember that we are talking about passive, rather than active, negligence; i.e., appellants' alleged negligence lies in their failure to properly interpret films, resulting in a delayed diagnosis of appellee, Carol Celmer's, breast cancer, and that the admitted negligence of Dr. George is similarly passive negligence for her role in the delayed diagnosis. Because we are talking about identical passive negligence on all three doctors' part, we conclude it does not satisfy the new and independent cause requirement. Appellants, Dr. Walker and Dr. Shin, are not accused of creating some new or additional injury to appellee, Carol Celmer, but of failing to properly interpret films that delayed the diagnosis of the same condition appellants initially failed to find. Because Dr. Walker's and Dr. Shin's negligence, was both passive and the same as that of Dr. George, we cannot find their conduct broke the causal connection between appellants' negligence and appellee's condition so as to make it a superceding cause. Consequently, this argument is not well-taken.
 {¶ 40} Thus, we conclude that the trial court did not err when it overruled appellants' motion for directed verdict. When we construe the evidence in the light most favorable to appellees there is sufficient credible evidence to permit reasonable minds to come to different conclusions on the issue of causation. Therefore, it was appropriate for the judge to overrule appellants' motion for directed verdict and permit the jury to weigh the evidence. Appellants' second assignment of error is without merit.
 {¶ 41} Based upon the foregoing the judgment of the Trumbull County Court of Common Pleas is affirmed.
O'Neill, J., concurs.
Grendell, J., concurs in judgment only.